## STATE v̇. HARTNESS.

(Filed March 26, 1901.)

INSTRUCTIONS—*Homicide—Excusable Homicide—Request of Jury for Instructions.*

> Failure of the court to define excusable homicide on request of jury is error, although the court had previously instructed the jury as to excusable homicide.

INDICTMENT against George Hartness for murder, heard by Judge *T. A. McNeill* and a jury, at May Term, 1900, of CHEROKEE County Superior Court.

*Robert D. Gilmer,* Attorney-General, for the State.
*Dillard & Bell,* and *E. B. Norvell,* for the defendant.

COOK, J. The prisoner was indicted and tried for murder —was convicted of murder in the second degree. He mainly relied upon the plea of self-defence.

128——37

From the uncontradicted evidence, as stated in the case, it appears that the deceased was shot in the evening, about, or a little after, sunset, in the yard of the prisoner, who had been absent from home during the afternoon. Unfriendly relations had sprung up between prisoner and deceased, growing out of the marriage of Julia James, a girl about fourteen years old, and prisoner, beginning shortly before the marriage, with the declaration by deceased, "that George (meaning the prisoner) and Julia James were going to be married, and if they did he would have her if he had to sink him into hell;" and immediately after the marriage, deceased armed himself with a Winchester rifle and pistol (which he carried constantly), and "followed after" prisoner, making threats, and saying "his purpose was to annoy him until he provoked him into saying something, and then kill him;" that he was "running after" prisoner's wife, causing "talk" about her in the community. Prisoner, knowing these facts, and his character for violence, notified him, through a friend, to stay away from his house, to which he replied "he would go when he got ready." On the day of the shooting the prisoner had left home about noon, returning a little after sunset. When he approached his house, and being very near, he saw deceased in his yard, having just come out of his house in company with his wife and several others. It was then that prisoner shot him. As to the circumstances of the shooting, the evidence is conflicting, prisoner testifying to having been in the road, near the house and heard him say, as he sprang out of the house into the yard (in reply to a suggestion that he had better leave, as George—the prisoner—might come), "God damn him, let him come" (having his rifle resting on his foot and pistol in his pocket), and apprehending that deceased was about to kill him or do him great bodily harm, and under such apprehension shot him; while one witness, a boy about twelve years old, testified that the shooting was

done from behind a chimney by the prisoner, whom he recognized; that the gun (a rifle) kicked him down and he got up and ran off. This testimony was discredited by witnesses who knew the *locus,* and said that the witness could not have seen a man at that place from the place where he said he was sitting.

After the jury had been charged by the Court as to murder, murder in the second degree, manslaughter and excusable homicide, and "after remaining out in their room some time, came into Court and announced their failure to agree, and requested the Judge to define the four degrees of homicide." "In response to this request (the case states) the Judge defined murder in the first degree, murder in the second degree and manslaughter, and then said: 'If, upon the whole case, the prisoner ought to be acquitted, this is excusable homicide.'" To this the prisoner excepted. We think his Honor erred in not *"defining"* excusable homicide as the jury had requested. To render a just verdict the jury must not be in doubt as to the law which they apply to the facts. This they can not do unless the Judge states clearly the particular issues arising on the evidence, and plainly and fully instructs them as to the law applicable. It further appears from the record that "after again returning (to their room) and after having remained out some hours, the jury came into Court and asked the presiding Judge 'whether at the time the fatal shot was fired the fact that prisoner was entering his own yard made any difference?'"

From this inquiry it appears that the jury had failed to understand what was meant by excusable homicide, as before defined by the Court; they wanted to know whether the prisoner had more rights there in his own yard than elsewhere; whether he had a right to go into his yard, notwithstanding the menacing presence of deceased, or should he have deserted his premises and fled; or whether he had a right to take

life in driving him away, if it could not be accomplished with less force. And to this inquiry, as appears from the case, the Judge made no response, further than to read again his former charge, which was not directly responsive, and is as follows: "If the jury shall find from the evidence that the prisoner had been warned only recently before the killing that deceased had declared his purpose to annoy him until prisoner was provoked into saying something, and then kill him, and had made other threats, and prisoner knew the character of deceased for violence, and that as prisoner entered his yard, or was about to do so, prisoner heard deceased say, as he saw him spring out into the yard, in reply to a suggestion that he had better leave, as George (the prisoner) might come, "God damn him, let him come," and deceased was armed with a Winchester rifle, and the prisoner reasonably apprehended that the deceased was about to kill him or to do him great bodily harm, and under such apprehension the prisoner shot and killed the deceased, the jury should acquit the prisoner; but of the reasonableness of this apprehension the jury are the judges, and not the prisoner, upon the whole circumstances at the time of the shooting." To which prisoner excepted.

We think his Honor erred in failing to instruct them specifically upon the question submitted. They should not have been left in doubt as to the duties and rights of the prisoner in entering upon and defending the sacredness of his home against a violent trespasser, and protecting the virtue of his young wife from the designs of a man who had threatened her ruin.

As a new trial must be had, it is deemed unnecessary to pass upon the other exceptions, as they may not again arise.

*Venire de novo.*